The next matter, number 25-1830, number 25-1833, number 25-1834, and number 25-1835, Hurley, Cantonese, Skeffington, and Cantonese v. Robert Curtis et al. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin. Good afternoon, your name is Richard K. Latimer, Falmouth, Massachusetts, for the plaintiff appellants. The several issues raised on this appeal are applied to all plaintiffs and all defendants. It's the same basic issue as to qualified immunity. The issue of consent has been raised. It's the same issue. And then there are two issues under state law, intentional infliction of emotional distress, and conspiracy to put Mr. Catanese out of business. On the first Hold on one second. I apologize. If I may, sir, I apologize. Could you just move the microphone a few inches further away? Oh. Yes, sir. Okay. Because I think there's some interference with the device. Yeah, it's feedback. I apologize. Thank you. Okay. On the qualified immunity issue, the short answer is Mincy versus Arizona. In 1974, more than 50 years ago, Supreme Court sent a very clear message to overzealous police officers about the Fourth Amendment. And that message was that you do not use an emergency entry into a property without a warrant to conduct a crime scene investigation. My brother has made much of the fact that, well, the crime scene investigation was four hours in Mincy. That's the wrong end of the timeline. Because in Mincy, the emergency responders were there. The people who were wounded, including Mincy himself, were still there when the detectives came in ten minutes later and began the crime scene investigation within ten minutes. Counsel, let me just say... They didn't even wait for the emergency to be over. Excuse me. I mean, factually, this is a very complex case. We've got a lot of plaintiffs, a lot of defendants, a lot of incidents. It would be helpful to me if we could focus on particular incidents. And in that vein, I'd like to talk to you about the January incident, if you will, which is another overdose incident. And there are, as I understand it, there are two entries at issue. I want to talk about the second entry, because there is a suggestion in the briefing and in the record that I believe it's Officer Carpenter was not involved in that second entry, that it was Trooper Waskiewicz that was involved. And that case eventually went to trial. So because this is a situation where we've got state troopers involved, we've got state troopers involved, it's important to know whether the factual record supports the involvement of the Falmouth police officers. So could you address that issue? Does the record support the proposition that Officer Carpenter was involved in that second entry, or was it just Trooper Waskiewicz? No, it was very clear. In fact, Officer Carpenter got there before Waskiewicz. What happened was, there was the overdose. Officer Martin properly entered without a warrant because of that exigency. She did a thorough sweep of the property, which she's entitled to do. She asked the residents about the drugs. She was told by the residents what the victim had used. That was the end of the exigency. It wasn't until after that, that the detective Carpenter arrived. And the detective Carpenter, this is long before Waskiewicz arrived, then began an extended criminal investigation into the owner of the property, Joe Catanese, which is the same thing that had happened in the second entry in December, and the first entry back in October. In each instance, all within the space of three months, Falmouth police officers used an emergency warrantless entry into the house, which initially was totally valid. And then, just as in Mincie, they turned that into a crime scene investigation. Counsel, just to follow up on Judge Lopez's question, the way I understood the record, and you can tell me if you disagree, on the very specific question of whether Detective Carpenter was involved in a second search, was that the only facts alleged in support of that claim were not sufficient, because nobody was able to confirm that he had conducted the subsequent search. There was a subsequent search, but none of the people who were present in the premises at the time said that Detective Carpenter conducted it. And your client, I think, who also may have filed an affidavit and alleged this wasn't on the premises. So I understood the record to be that there just wasn't actually any supportable evidence that Detective Carpenter had conducted the second search. Can you address that? Well, what are we talking about? Are we talking about the December incident? No, the January incident that Judge Lopez asked about. The record is very clear that Carpenter entered. In fact, after he entered, he and the initial officer, Martin, they separated these two individuals. Now, that in itself tells you that this is a criminal investigation. Yes, counsel, you're right. The record shows he entered and Martin and he separated. I was just trying to focus on the question of whether Detective Carpenter did another search after Officer Martin did a search. And I think the record, as your opposing counsel represented it, was that there was no evidence, proper supported evidence that Detective Carpenter had conducted a second search. Do you disagree? Yes, that was Ms. Skeffington, a precipient witness who was there. She said that she saw Carpenter engage in a second search. I thought that her testimony was that she didn't know who conducted the second search, that she saw people walking around in the rooms, but she couldn't say that it was Carpenter. The record is that Carpenter made the second entry after the exigency had ended, after Andy Plant had left. He was a detective, just like the detectives in Bincy. His purpose there was to conduct a criminal investigation because that is what the witnesses say he did. He asked them questions about Joe Catanese, he and Martin. In fact, I forget which one of them said that he obviously didn't like Joe Catanese. Now, this was the two of them. It had nothing to do with Weskowitz. This is the two of them doing that, conducting a criminal investigation into Joe Catanese. In Mincy, there was a medical emergency. Several people were wounded. The emergency responders came within 10 minutes before the emergency even ended. The detectives came and did a search of the house, not looking for weapons or anything related to the shootings, but looking for drugs, which they found, which the Supreme Court threw out. That was only 10 minutes. Isn't it potentially different that the source of the harm here is a drug overdose, so that searching for drugs would be more relevant to the cause of the officers being there in the first place, unlike in Mincy? As a result, on the second prong of qualified immunity, to establish that the right is clearly established, how much help could Mincy be to you? Well, it's a lot of help, because there's no material difference. The fact is that when Martin came, she did a thorough search, a thorough sweep. She asked everything. She found out everything there was to know. Mr. Plant was transported to the hospital. There was, at that time, no more emergency on the premises of Genesis House. But knowing the drugs wouldn't be useful for treating the person? They knew what drugs that he had used. There was nothing else that would be useful for treating the person. I'm just trying to think, I mean, just in terms of just clearly established law. In Mincy, there's no relationship between the thing being searched for and the source of the harm, as I understand it. Maybe that's wrong, you could tell me different. And in this case, there was nothing in terms of... Well, I guess the question is just objectively, in the case of a drug overdose, searching for the drugs that may have been involved in it, just in terms of a clearly established doctrine. That would not be an emergency for the simple reason, even if they found some drugs, they would still have to take them to a laboratory, have them analyzed before that could be of any use to the emergency doctors. It depends what they found and what... But they didn't find any drugs. It just would depend what you found. You could find something that would be of interest to the doctor right away. But they already knew, based upon what the witnesses told the officer, Martin, they told her that what he took was heroin and fentanyl. I guess I'm trying to get you to address just qualified immunity doctrine and what makes something clearly established, and whether case law dealing with the circumstances in Mincy can make it clearly established what kind of conduct is supposed to occur with respect to post searches and emergency aid when the source of the harm is a drug overdose. It would make no difference if they had found drugs, as I said, because it would take hours for a laboratory to evaluate those drugs. So there was no emergency there in finding the drugs. Let me ask you about the December incident, where we again have a second entry. That's when they're searching for, I guess, Mr. Andrade. There is a warrant out for him. They enter the residence a first time. He's not found. They come back a bit later, a second time. And it seems to me your briefing and argument ignores important facts, which are, I mean, as the police portray it, they're coming back to execute two arrest warrants for individuals that they have good reason to believe are living there. One is identified by the initials TN, and the other is Nick Cottonese. Turns out there's an outstanding warrant for him. Now, just in terms of basic law, if they have reason to, I mean, they know they're there, and they have reason to believe that they are living there, doesn't that justify their entry into the premises to execute those arrest warrants? No, Your Honor, for the simple reason that they were operating on an exigency, which was knowledge or information that a fugitive was on the premises. So arguably they had an arrest warrant for the fugitive, but not a search warrant for this house. The arrest warrant for the fugitive was for a different address. But I thought the rationale for that second entry was not that they're, yes, they're still looking for him, but they now have arrest warrants for two individuals who are, they have reason to believe, I mean, they know it, they're living on the premises. Let me explain. There were three entries. You're talking about the second entry. Okay. On the first entry, they didn't know that Nick Cottonese had an arrest warrant. They didn't know that. They made, this is like the fruit of the poisonous tree. They come in, they see Nick Cottonese, and so they called to see, well, does he have an arrest warrant? That's a criminal investigation. And they find out, well, yes, he does. So then they come back the second time with arrest warrants for Nick and for T.N., the visitor. What we're talking about here in Bartholomew is the third entry, where he gets T.N. to tell him, oh, well, Mr. Andrade was hiding under the stairs. Now, even if that were true, even if that were plausible, at that point, that does not give him cause to go back without a warrant. At that point, he can very well go to Falmouth District Court, get a warrant, and go in. Meanwhile, he wants everyone to believe that 10 state troopers did a thorough search of the house, didn't find Andrade, who allegedly was hiding under an open stairway in the cellar. This is not a closet or anything. This is an open stairway. When Bartholomew reported what T.N. told him to the state police, they didn't even want to come back, because they knew there was no reason to come back. Those are the facts. Now, that's the fact on the third entry on December 4th. The first entry was valid. The second entry, I say, was not valid, because they did not know that Nick Catanese or T.N. had a warrant out for them when they entered. They found that out afterwards by calling. That was a phishing expedition. And then... Thank you. Thank you. At this time, would Counsel for Apeliz please introduce himself on the record? Good afternoon. Good afternoon, Your Honors. Matthew Hamill, on behalf of the... Could you lift that higher? Thank you. Good afternoon, Your Honors. Matthew Hamill, on behalf of the defendants Apeliz. I will address... May it please the court, I will address the court's inquiries in the order in which they were put to my opponent, Judge Lopez, to address your question as to the January 23rd, 2020 entrance for the fatal overdose. There, you're spot on that the state trooper arrived, who's not a party to this case. His case went to the jury for a defense verdict. The state trooper arrived, I believe, at 7.25 PM, far later than this exigency. Officer Martin was dispatched to the property at about 4.46 in the afternoon. So, I have no qualms about saying that that entry was too late and exceeded the bounds of the exigency. In terms of, Judge Rookman, to address your question as to the evidence that Detective Carpenter performed a subsequent search... I just want to be... You said no qualms in saying it was too late. Who are you referring to? The state trooper. State trooper. Correct, Your Honor. Thank you. And to address your question on the second search, you're spot on, and that's a specific finding that Judge Sarris made in her order. There's no evidence that Detective Carpenter made a subsequent second search. Skeffington's testimony, and this is at the record appendix at 471 to 472, she testified explicitly that she did not observe Carpenter search the entire house, Joseph Room, and again, the record's undisputed that Joseph Catanese, who's one of the other plaintiffs in this case, was not present at Chetis' house at the time. Can I ask you, just so I understand, in your brief at page 23 and 24, when you say, as discussed further herein, Detective Carpenter also conducted a limited protective sweep and made similar reasonable inquiry as to the circumstances of the overdose, cited at 307. What are you talking about there? Yes, Your Honor. So I think it would be helpful just to clarify this as to the January 23rd response, the timeline. So as I mentioned, Officer Martin responded at 446 p.m. The fire department responded five minutes later, and this is in the record at 460, Your Honor. EMS departed, presumably with the overdose victim, at 520, and Judge Saris made a finding on the record that Detective Carpenter arrived about a half hour after Officer Martin arrived. So around, in other words, 515. When he did arrive, Your Honor, again, he was let into the house. This was as they were still working on the victim at the house, or at least when he was in the process of being departed or transferred to the hospital, and he did conduct a brief, you know, protective sweep of the area, specifically limited to where it was reported that this incident had occurred, that this individual had apparently sniffed heroin in his bedroom. They did a quick check of that area and that couch area. But the, what I'm referring to, there's no evidence of a second search. What I'm referring to is that the state trooper who arrived at 725 p.m. photographed the entire premises. There's no competent evidence in the record that Detective Carpenter was involved in that search. And I think that's a finding that's well supported by the record. Do we know when Detective Carpenter leaves based on the record? I'm not sure that's clear on the record, Judge Rickleman. I don't think I can point you to a specific part of the record that would say that. And then Chief Judge Barron, you, I think, again, were spot-on with distinguishing the Mincy case. I think the presence and the notion of what turned out to be a fatal drug overdose is critical here, and that's what distinguishes this case from Mincy and makes Mincy not a clearly established precedent for purposes of defeating qualified immunity. How far did you go with that? So when you said to Judge Lopez, I have no problem saying that's too late. That must be some idea that Mincy is giving us some guidance that would make it clearly established, because otherwise you wouldn't be able to say that. You would just say Mincy gives no guidance because this is a drug overdose case. So how are we supposed to do the second step, given that we don't have a case of an emergency aid entry involving searches for drugs, where the drug overdose is the cause of the harm? Certainly, Your Honor. So I have two responses to that. The first is, I think, as this Court is well aware, the touchstone under the Fourth Amendment is objective reasonableness. So I think we can first look at what the officers did and what their actions were once they responded for this overdose. And I think the testimony and the record is very clear that they were, this protective sweep and, you know, limited search was focused on the drugs. And Nicole Skeffington testified that. So how far does that go? I mean, after the person who has had the overdose is being transported or has reached the hospital, can they continue to search? Would it be reasonable to conclude that, yes, you could, and Mincy doesn't say otherwise? Or do we only focus on what's happening while the person's still there? Or does it matter whether we know at the time what the source of the drugs were? You know, if it's clear he's got a needle in his hand, why are you looking for pills? That, I mean, that kind of, how are we supposed to do that? Because you obviously, I think, understandably aren't telling us, they can do whatever they want. Mincy doesn't tell you anything because Mincy wasn't a drug overdose case. So if we're in a world in which we're supposed to extrapolate from Mincy, how do we do it? Certainly, Your Honor. And absolutely, there's a line somewhere. And I trust that the will draw it. What I would suggest is, again, the facts on the ground that were available to Detective Carpenter and Officer Martin were not only that the victim of the overdose was in rough shape and was on his way to the hospital, it was also that this was a property that they'd responded to repeatedly, repeatedly. And that's in the record in Detective Row. Well, Your Honor, I think it ties into the second part. But I think it's relevant because this was a place that was known and that had been involved in criminal activity in the past. And I think that's why that would be relevant. If you're accepting that Mincy is a guide here and a clear guide, it would seem to me that the search that follows has to be related to the emergency. Certainly, Your Honor. And then I'm just trying to figure out how do we think about what that line is? Does it make sense to be searching for drugs after the person has been taken to the hospital? Is there any indication that the search was non criminal in nature as opposed to trying to find out the source of it so they could advise the doctor? Was there any indication from the emergency aides that anybody needed to know what drugs there were, et cetera? Certainly. Well, I do believe there's evidence in the record. Nicole Skeffington's testimony for one thing, that absolute police were looking for drugs. Counsel, let me let me ask you about that because there's a a theme running through the appellant's briefing to the effect that the Falmouth Police and the State Police were very much focused on the owner of Genesis, Joseph Cotones, and on at least two occasions, well after the emergency was over, individuals had gone to the hospital. There was evidence that they had found his personal office, the closet, and they had rifled through all of his papers. And then there's that sort of ugly incident between Bartolome and Cotones, the phone call where he threatens him, I'm going to put you out of business. This place is a disgrace. And so the theme is that this is really not a search for drugs that might explain the overdose. What they're really focusing on is Cotones and trying to build a criminal case against them. I mean, how do you, how do you, I mean, the record does seem to support that there was a strong focus on Cotones. So how, how do you, how do you defend that as nothing more than a search for drugs that might explain an overdose? Certainly, Your Honor. Well, I would, I would first direct the court to a case the court is not familiar with, but Michigan v. Fisher. So subjective intent of the Falmouth police officers who were responding to these emergencies, to these 911 calls for overdoses, is not relevant to the objective reasonableness of their entry and their conduct thereafter. So I would suggest that even if there's evidence in the record, and I don't dispute that, Judge, there is, that they were asking questions about the owner of the house and drug activity at the house and things of that  Again, in the realm of the objective reasonableness of what was being asked, and I think this was a finding made by the judge at summary judgment. I don't believe those are, our position is that those are not unreasonable questions to be asking in light of the, to get to Chief Judge Barron's point, in light of the fact that this was an ongoing problem at this particular sober house. How are we supposed to, like, I understand that idea. Let's say you have a heroin overdose, you have a doctor saying, happens to be on scene saying, you know, can somebody make sure, they're saying it's a heroin overdose, can someone confirm that that's what he took? And you have somebody asking, you know, is he a heroin user? Where does he keep the heroin? And then subjectively, what he's really trying to do is make a case to get a, heroin conspiracy he's working on for years. We would ignore that because objectively in the circumstance, asking the question in that circumstance is obviously reasonable. But it doesn't follow that you jump up a level of generality that because you have a drug overdose, any questions or efforts to find drugs in the case, you say that, well, that's objectively reasonable too. And then you get the benefit of Michigan versus Fisher. It seems like there's gotta be some reason to think that the types of questioning and searching for drugs that is being undertaken is objectively reasonable to think that type of activity is actually in context related to the emergency. Is that just, I mean, is that, I mean, how do we think about that? Certainly your honor. And I think to answer that, I'll go back to a question you posed to me earlier. Um, which sort of what, what justifies the the staying on the property even after the victim had been transported. And I would note, and I think the infant a case directs us to look at the totality of the circumstances and hear the totality of circumstances. Officer Martin and Detective Carpenter were speaking to the two occupants of the house, Nicole Skeffington, the plaintiff and Christopher Gino. Both of them were showing signs of intoxication. There is evidence in the record that Officer Martin suspected that Nicole Skeffington had been hiding the victim's phone. So in the context of all these things, I think if you look to some of the cases, I believe we cite them in our brief. If not, I will find them for the court. But where destruction of evidence is a risk. And I understand they're sort of not on par, but I think it's analogous. And I think it could where you have evidence that this is a place we've responded to multiple times for drugs. These individuals are intoxicated. Someone's on route to the hospital who is in very bad shape from presumably an overdose. And you have an individual there, maybe not being forthright with where certain evidence is related to that. I think you can make the case that those questions are reasonable and those inquiries are reasonable. And again, I would point to the testimony that they were looking for the drugs. That's a little hard to square with Mincy, isn't it? Because that suggests that once you're in there for an emergency, you can kind of do a lot in the name of stopping destruction of evidence of a crime. Well, I think it has to be tailored again to the emergency. And I'm not saying they could shut down. And Mincy, I think the search there, my opponent and I might disagree on the scope of the search. Mincy, my recollection is that this was a very expansive search. They, I believe, indexed the entire house. This protective sweep here was nothing of the sort. And on that point, I would direct the court to the Stricker case, which is a six third case, but we cite in our brief, which I think is very applicable on these facts. And I think supports the argument that this limited inquiry, so long as it remains tailored to the initial exigency, should be permissible under the Fourth Amendment. Counsel, you made a series of arguments in your brief that you think a number of the issues on appeal are actually waived at this point. And I just wanted to give you a chance to address that. In your view, on behalf of your clients, what do you think has been waived and what do you think is still right for decision by us? Yes, Your Honor. I believe the majority of the state law claims, with the exception of the TOR claim under the Massachusetts Civil Rights Act, which I do believe is a live issue for the court, but the TOR claims, the intentional affliction of emotional distress claim, false imprisonment, false arrest, those were not addressed, as far as I could tell, besides from the summary of the errors section in the brief. So I believe that's waived, because there's really no developed argument there. Certainly, the reasonableness inquiry on the Fourth Amendment would control, in large part, some of those state law claims, false imprisonment, false arrest, I understand that, but I do believe those claims have been waived for not being addressed in the principle brief. But you think the state civil rights claim has not been? I don't believe the... I believe counsel briefed the... If I just may finish, Your Honor, the claim under the Massachusetts Civil Rights Act. Counsel, very quickly on the nature of the questioning that took place, they say, well after the victims of the overdose had gone to the hospital. The portrayal in the appellant's brief is that a lot of that questioning, again, was about... Had nothing to do with trying to determine what drugs might have been used. They were about Joseph Cotteney's and possible... His involvement, perhaps, in overdoses. And if those characterizations are supported by evidence of the record, why don't we have genuine issues of material fact about the reasonableness of the questioning that took place well after the emergency seemed to have been abated? Again, if there's evidence to support that, why don't we have... How can we defend the summary judgment rulings? Certainly, Your Honor. I think the... I won't dispute that there is evidence in the record that there were questions about Joseph Cotteney's and his involvement at Genesis House as the owner of that property. I think the controlling case... Again, I would sort of retreat, Your Honor, to the reasonableness standard. And if the Falmouth police are continuously called back to this house, I don't think it's an unreasonable question to ask, what is going on at this house? Well, they're... Yeah, they're sick of it, but that doesn't mean that they can take liberties with the emergency doctrine to turn their inquiries into a criminal investigation into Joseph Cotteney's. Certainly, and I... It's a fair question, Your Honor. I would suggest that even taking the facts in the light most favorable, this line of questioning, I think, falls within the line of reasonable questioning under the Fourth Amendment, even under the emergency aid exception where the subjective intent... I know there's allegations of conspiracy and things of that nature, which we don't believe are supported. But I think... Just so I understand, is that because you're saying that objectively the questioning about Joseph Cotteney's is itself in aid of the emergency? I would suggest that... Yes, Your Honor. I do think questioning about where did these drugs come from? Is there an involvement with... Is there some drug trafficking issue going on here? I do think that's going to aid in the emergency. And just give me the last sentence, why? Because if they can determine the source of these narcotics, if it is coming from within the house, then perhaps that can help treat the victim who was at the hospital at the time. So I would suggest that that's a reasonable line of questioning. Thank you. Thank you, Your Honor. And Judge Lopez, as the last lawyer in the last case, congratulations and thank you. Thank you. Thank you, counsel. That concludes argument in this case.